RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0049p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

FREEDOM FROM RELIGION FOUNDATION, INC.
and DOUGLAS J. MARSHALL,

          *Plaintiffs-Appellants*,

      v.

CITY OF WARREN, MICHIGAN; CITY OF
WARREN DOWNTOWN DEVELOPMENT
AUTHORITY; and JAMES R. FOUTS, Mayor of
Warren, Michigan,

          *Defendants-Appellees*.

No. 12-1858

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cv-15617—Lawrence P. Zatkoff, District Judge.

Argued: January 25, 2013

Decided and Filed: February 25, 2013

Before: SILER, SUTTON and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Danielle J. Hessell, BUTZEL LONG, Bloomfield Hills, Michigan, for
Appellants. Raechel M. Badalamenti, KIRK, HUTH, LANGE & BADALAMENTI,
PLC, Clinton Township, Michigan, for Appellees. **ON BRIEF:** Danielle J. Hessell,
Jennifer A. Dukarski, BUTZEL LONG, Bloomfield Hills, Michigan, for Appellants.
Raechel M. Badalamenti, KIRK, HUTH, LANGE & BADALAMENTI, PLC, Clinton
Township, Michigan, for Appellees. Daniel S. Korobkin, AMERICAN CIVIL
LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, Ayesha N. Khan,
Gregory M. Lipper, AMERICANS UNITED FOR SEPARATION OF CHURCH AND
STATE, Washington, D.C., Shelli L. Calland, COVINGTON & BURLING LLP,
Washington, D.C., Stephen W. Fitschen, THE NATIONAL LEGAL FOUNDATION,
Virginia Beach, Virginia, John P. Tuskey, BINGHAM AND LOUGHLIN, P.C.,
Mishawaka, Indiana, for Amici Curiae.

---

**OPINION**

---

SUTTON, Circuit Judge.  For many years, the City of Warren, Michigan, has put up a holiday display in the atrium of its civic center between Thanksgiving and New Year's.  The display includes a range of secular and religious symbols—a lighted tree, reindeer, snowmen, a "Winter Welcome" sign and a nativity scene among them.

In 2010, the Freedom from Religion Foundation wrote a series of letters to the Mayor of Warren asking him to remove the nativity scene.  The City refused.  In 2011, the Foundation took a different tack.  Instead of asking the City to remove the nativity scene, it asked the City to add a sign with these words:

> At this season of
> THE WINTER SOLSTICE
> may reason prevail.
> There are no gods,
> no devils, no angels,
> No heaven or hell.
> There is only our natural world,
> Religion is but
> Myth and superstition
> That hardens hearts
> And enslaves minds.
>
> Placed by the Freedom From Religion Foundation
> On Behalf of its State Members
> ffrf.org
>
> State/Church
> KEEP THEM SEPARATE
> Freedom From Religion Foundation
> ffrf.org

R. 1-6.  The City refused.  In response, the Foundation and one of its members filed this lawsuit based mainly on the freedom-from-establishment and free-speech guarantees of the First and Fourteenth Amendments.

The district court rejected these claims, and so do we. The nativity scene, when accompanied by this collection of secular and seasonal symbols, does not amount to an establishment of religion or for that matter an impermissible endorsement of it. *See Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 613–21 (1989); *Lynch v. Donnelly*, 465 U.S. 668, 683 (1984). Because the display amounts to government speech and because the First Amendment does not prohibit a government from making content or viewpoint distinctions when it comes to its own speech, the City did not violate the Foundation's free-speech rights by refusing to add the Foundation's sign. For these reasons and those elaborated below, we affirm.

I.

Shortly after Thanksgiving each year, the City of Warren puts up a holiday display in the atrium of the Warren Civic Center, the City's primary municipal building. The display includes a lighted tree, ribbons, ornaments, reindeer, wreaths, snowmen, a mailbox for Santa, elves, wrapped gift boxes, nutcrackers, poinsettias, candy canes, a "Winter Welcome" sign and a nativity scene.

In January 2010, the Freedom from Religion Foundation and one of its members, Douglas Marshall, sent a letter to Mayor James Fouts, asking Warren to remove the creche from future holiday displays. Two months later, the Foundation sent another letter to Mayor Fouts reiterating its concerns. Mayor Fouts did not respond to the letters.

Undeterred, the Foundation sent a third letter asking the City not to include a nativity scene in the upcoming 2010 holiday display. Mayor Fouts answered on December 8, explaining that the nativity scene would remain and that it did not violate the Constitution.

The following year, the Foundation tried something new. It asked Mayor Fouts to include the Foundation's own sign in the display. The Foundation described the sign as "an attractive sandwich board," which would contain the message quoted above. R. 1-6. The Foundation threatened to sue if the Winter Solstice sign was not added to the holiday display. Mayor Fouts responded as follows:

I have received a letter (December 9, 2011) from Mr. Douglas J. Marshall, a member of your organization, for permission to display a sign in the City Hall atrium near the Nativity Scene.

I have reviewed the proposed 2-sided "sandwich board" sign. The language on the proposed sign is clearly anti-religion and meant to counter the religious tone of the Nativity Scene, which could lead to confrontations and a disruption of city hall.

This proposed sign is antagonistic toward all religions and would serve no purpose during this holiday season except to provoke controversy and hostility among visitors and employees at city hall.

Your phrase that "Religion is but myth and superstition that hardens hearts and enslaves minds," is highly offensive and is not a provable statement. Likewise, your statement that there are "no gods" and "no angels" is also not provable.

If you requested permission to put up a sandwich board saying that there is no Santa Claus, you would be met with the same response. Santa Claus lives in the minds and hearts of many millions of children. The belief of God and religion lives in the hearts and minds of hundreds of millions of people and is as much a part of the fabric of America, as the belief in democracy and freedom.

Indeed, our country was founded upon basic religious beliefs. The President takes the oath of office on the Holy Bible. The U.S. Congress has a house chapl[a]in. Both major political party leaders invoke God in their speeches and pronouncements. Our coins have "In God We Trust." We have a whole host of other religious traditions in government situations at all levels.

Everyone has a right to believe or not believe in a particular belief system, but no organization has the right to disparage the beliefs of many Warren and U.S. citizens because of their beliefs.

Thus, I cannot and will not sanction the desecration of religion in the Warren City Hall atrium.

As I would not allow displays disparaging any one religion, so I will not allow anyone or any organization to attack religion in general. Your proposed sign cannot be excused as a freedom of religion statement because, to my way of thinking, this right does not mean the right to attack religion or any religion with mean-spirited signs. The proposed sign would only result in more signs and chaos.

When I allowed a display in city hall celebrating Ramadan, the Moslem holy season, I received many calls objecting but I would never have

allowed a sign next to the Ramadan display mocking or ridiculing the Moslem religion.

**In my opinion, Freedom of Religion does not mean "Freedom Against or From Religion."** And Freedom of Speech is not the right to yell "Fire!" in a crowded theatre. Indeed, there are common sense restraints on all constitutional rights.

**Your non-religion is not a recognized religion.** Please don't hide behind the cloak of non-religion as an excuse to abuse other recognized religions. You can't make a negative into a positive.

Clearly, your proposed display in effect would create considerable ill will among many people of all **recognized** faiths.

During this holiday season, why don't we try to accomplish the old adage of "Good will toward all"?

R. 1-9.

The Foundation and Marshall sued. Named in the complaint were the City of Warren, Mayor Fouts and the Downtown Development Authority. The complaint alleged that the inclusion of a nativity scene in the holiday display together with the exclusion of the Foundation's sign violated the Establishment, Free Speech and Equal Protection Clauses of the Federal Constitution. On summary judgment, the district court rejected the claims as a matter of law.

II.

The First Amendment says that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. As made applicable to the States through the Fourteenth Amendment, the Clause prohibits government from favoring one religion over another or from favoring religion over irreligion (or irreligion over religion). The courts have identified two (relatively) safe harbors: (1) a government may provide benefits to faith-based entities if the benefits are available to secular and religious entities alike; and (2) a government may invoke the divine through words and symbols if they have religious *and* historical meanings or faith-based *and* solemnizing effects, and in the process offer at most incidental benefits to any one faith or to faith in general. As a matter of doctrine, purpose-based, effects-based and endorsement-based

tests capture these ideas, creating a workable demarcation between permitted and prohibited conduct.

Happily for us, much of the "line-drawing" with respect to holiday displays has already been done. *Lynch*, 465 U.S. at 679. Pawtucket, Rhode Island, created a holiday display that included a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, a clown, an elephant, a teddy bear, colored lights, a large "Seasons Greetings" banner and a nativity scene in a park owned by a nonprofit organization. *Id.* at 671. Noting that "[t]here is an unbroken history of official acknowledgement by all three branches of government of the role of religion in American life from at least 1789," *id.* at 674, the Court upheld the display, the creche included. Essential to this conclusion was an assessment of *all* of the symbols in the display. Otherwise, a "[f]ocus exclusively on the religious component of any activity would inevitably" stack the deck against faith-based symbols. *Id*. at 680. In the context of all components of the display, the presence of the creche "depicts the historical origins of this traditional event long recognized as a National Holiday" *Id.* "[W]hatever benefit [there was] to one faith or religion or to all religions [was] indirect, remote, and incidental." *Id.* at 683. The display was "no more an advancement or endorsement of religion" than the recognition of Christmas as a national holiday or the display of "religious paintings in governmentally supported museums." *Id.*

Five years later, *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989), toed this line. On one side, the Court upheld a holiday display located in front of City Hall that included a 45-foot Christmas tree, an 18-foot Chanukah menorah and a "salute to liberty" sign. *Id.* at 620. On the other side, the Court invalidated a creche scene displayed alone in the county courthouse. *Id.* at 601–02.

If the multi-purpose, multi-symbol Pawtucket and Allegheny County displays did not offend the Establishment Clause, then neither does the Warren display. The Warren exhibit parallels the Pawtucket one and is less faith-centered than the permitted Allegheny County exhibit. Included with the nativity scene in Warren's display is a series of secular figures comparable in all relevant ways to the Pawtucket display:

Santa's mailbox, an elf, ornaments and so on, even a nutcracker for good measure. Not just the Supreme Court, but our court and many others as well, have upheld similar displays. *See Doe v. City of Clawson*, 915 F.2d 244, 248–49 (6th Cir. 1990); *see also Elewski v. City of Syracuse*, 123 F.3d 51, 54–55 (2d Cir. 1997); *ACLU of N.J. ex rel. Lander v. Schundler*, 168 F.3d 92, 104–08 (3d Cir. 1999) (Alito, J.); *Mather v. Village of Mundelein*, 864 F.2d 1291, 1292–93 (7th Cir. 1989) (per curiam); *ACLU v. City of Florissant*, 186 F.3d 1095, 1098 (8th Cir. 1999).

The Foundation urges us to take a less-traveled road for three reasons. *First*, it claims that Warren's rejection of its Winter Solstice sign betrays the City's lack of neutrality as between the secular and the religious. That is not true even on its own terms. All but one of the objects in the holiday display are nonreligious. Ribbons, ornaments, reindeer, a lighted tree, wreaths, snowmen, a mailbox for Santa, elves, wrapped gift boxes, nutcrackers, poinsettias, candy canes, a "Winter Welcome" sign—all of them, all that is but the nativity scene—are secular. *See Lynch*, 465 U.S. at 692. Some of these symbols allegedly are rooted in pagan traditions. John Matthews, *The Winter Solstice: The Sacred Traditions of Christmas* 78–80 (1998) (making this claim with respect to Christmas trees). Some are connected to the winter season. And some embody the most commercial features of the holiday season. But none of these secular symbols has any roots in one faith or in faith in general. Look through the Old and New Testaments, even we suspect in their original languages, and you will not find any references to these symbols. It may be true that many of these symbols have become connected to European and American celebrations of Christmas over time, some through the happenstance of the time of year at which the holiday falls (at least in the western part of the Northern Hemisphere) and some through stories written and read over the years. But that did not suffice to invalidate the equivalent display in *Lynch*; it does not suffice here.

The composition of displays used to commemorate holidays and seasons, moreover, is not static. The breadth of symbols included in the Warren exhibit reflects not just the demands of the Establishment Clause but also the demands of democracy in

an increasingly pluralistic country. That presumably is why some cities no longer have such displays, why others have made a point of featuring symbols connected to other faiths (Warren had a Ramadan sign one year) and why a city like Warren would include words conspicuously ungrounded in any faith ("Winter Welcome"). Even the most faith-inspired phrases have taken on secular connotations over time. When one neighbor greets another in mid-December with "Happy Holidays," it is the rare person who hears "Happy Holy Days." *See* Webster's New International Dictionary 1188 (2d ed. 1950). What was once the most religious of invocations has become one of the most faith-neutral, even secular. One indeed can fairly wonder who has co-opted whom over time with these displays and words. But that is a matter for another day. The key lesson of *Lynch* and *Allegheny County* is that a city does not run afoul of the Establishment Clause by including a creche in a holiday display that contains secular and religious symbols. Warren readily meets that test.

*Second*, the Foundation argues that the Mayor's missive shows that the City's purpose in putting up a holiday display each year was to advance religion and that a reasonable observer would perceive it that way. The Foundation focuses on the Mayor's objection that the Winter Solstice sign, if added to the display, would "counter the religious tone of the Nativity Scene" and his observation that the Foundation's "non-religion" was "not a recognized religion." R. 1-9. Even if for the sake of argument we assume that the Mayor speaks for the City as the decision maker in this instance and even if we assume that a reasonable observer would know about the Mayor's letter when walking by the Warren exhibit, the Mayor's letter does not convert this otherwise-constitutional display into an unconstitutional one.

The Mayor said a lot of things in his letter. Just as a court may not isolate a creche in deciding whether a holiday display amounts to an impermissible establishment of religion, *see Lynch*, 465 U.S. at 680, it also may not isolate two sentences in a letter to show what the City meant by a particular action or how a reasonable observer would perceive that action. Taken in context, the overall point of the letter was to convey that the Foundation's request would be offensive to the religious and nonreligious alike and

ultimately would lead to the elimination of any holiday display at all.  That is why the Mayor said this:  "This proposed sign is antagonistic toward all religions and would serve no purpose during this holiday season except to provoke controversy and hostility among visitors and employees at city hall."  R. 1-9.  And this:  "If you requested permission to put up a sandwich board saying that there is no Santa Claus, you would be met with the same response."  *Id.*  And this:  "Everyone has a right to believe or not believe in a particular belief system, but no organization has the right to disparage the beliefs of many Warren and U.S. citizens because of their beliefs."  *Id.*  And this:  "As I would not allow displays disparaging any one religion, so I will not allow anyone or any organization to attack religion in general."  *Id.*  And this:  "When I allowed a display in city hall celebrating Ramadan, the Moslem holy season, I received many calls objecting but I would never have allowed a sign next to the Ramadan display mocking or ridiculing the Moslem religion."  *Id.*  These are not the words of someone trying to establish any one religion or religion in general; they are the words of someone trying to explain the common sense risks of disparaging faith-based and secular symbols, whether a creche or a Santa, alike.

A strict separationist perspective might suggest that the Mayor got carried away when he said that "our country was founded upon basic religious beliefs" and added a few other like-minded sentiments.  *Id.*  But the Establishment Clause does not demand strict separation between church and state in governmental words and deeds, even if that were somehow possible.  The Mayor indeed could have been more forceful on the point and quoted the Supreme Court in the process:  "We are a religious people whose institutions presuppose a Supreme Being."  *Zorach v. Clauson*, 343 U.S. 306, 313 (1952).  If the Court may say this about American government and if Congress may enact a law devoted to spiritual matters and called the Religious Freedom Restoration Act, all without violating the Establishment Clause, *see Wilkinson v. Cutter*, 544 U.S. 709, 712–14 (2005), surely the Clause does not stand in the way of the City's winter-solstice-free display and the Mayor's explanation for it.

It may be true that the Mayor misapprehended the Religion Clauses when he implied that atheists receive no protection from them by saying that the Foundation's "non-religion" was "not a recognized religion." In this respect, the Mayor, apparently untrained as a lawyer, may not have missed his calling. The Religion Clauses, it turns out, do protect the religious and nonreligious. *Wallace v. Jaffree*, 472 U.S. 38, 52–54 (1985). But this defense of his actions, premised on a misreading of precedent, does not transform his actions or the City's display into an establishment.

The short answer to the Foundation's Winter Solstice request was that the Supreme Court has long permitted exhibits like the Warren holiday display, and the Establishment Clause does not convert these displays into a seasonal public forum, requiring governments to add all comers to the mix and creating a poison pill for even the most secular displays in the process. That is the essence of what the Mayor said, and that is the essence of what the City did.

*Third*, the Foundation points out that Warren located its display in the atrium of the City's principal government building while Pawtucket placed the *Lynch* display on private property. A private location may indeed favor a city in the Establishment Clause calculus, as it suggests to lay observers and legal scholars alike that the speech does not amount to government speech. Warren's choice to put the display on public property offers some evidence that these were *its* actions and *its* symbols. But that does not doom the display. The permitted *Allegheny County* display appeared on public property and was more faith-centered than this one. *See Allegheny Cnty.*, 492 U.S. at 613–21. We too have upheld similar displays on public property, and so have other courts. *See Elewski*, 123 F.3d at 54–55; *Schundler*, 168 F.3d at 104–08; *Clawson*, 915 F.2d at 248–49; *Mather*, 864 F.2d at 1292–93; *Florissant*, 186 F.3d at 1098. The district court correctly rejected the Foundation's Establishment Clause claim.

## III.

The Foundation separately argues that the City violated its free-speech rights when it refused to add the Winter Solstice sign to the display. As the Foundation reads

the First Amendment, it requires the City, having opted to create a holiday display, to include competing messages and viewpoints. As we read the First Amendment, it does not.

The First Amendment prohibits governments from making any law "abridging the freedom of speech" of individuals. As written, the guarantee prevents governments from restricting the speech of individuals; it does not empower individuals to abridge the speech of government. The guarantee thus "restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). When the government speaks, "it is entitled to say what it wishes," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and "to favor and disfavor" all kinds of policies and points of view, *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in the judgment). That is why, as a general rule, "the government's own speech . . . is exempt from First Amendment scrutiny." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005).

*Summum* illustrates the point in a setting with many parallels to this one. The city of Pleasant Grove maintained a public park with fifteen permanent displays that portrayed the heritage of the town. 555 U.S. at 464. The objects ranged from a facade of the city's first fire station to a September 11 monument to a Ten Commandments monument. *Id.* at 465. At least eleven of the objects had been proposed and donated by private groups, but all had been approved by the city, and all had been placed on city property. *Id.* Summum, a Gnostic Christian sect, twice requested permission to erect a stone monument containing the Seven Aphorisms of its faith. *Id.* Pleasant Grove denied both requests, and Summum went to court invoking the free-speech guarantee. *Id.* at 465–66.

In rejecting Summum's claim, the Court held that the monuments amounted to government, not private, speech. *Id.* at 472. Why? Pleasant Grove maintained final approval authority over every aspect of the approval process; it was selective in deciding which monuments to add to the park; and it located all of the monuments on city

property.  *See id.* at 473.  By "effectively controll[ing]" the message being sent in these ways, it was the government, not the donors of the monuments or anyone else, that spoke.  *Id.*

*Summum* does not stand alone.  A federal promotional campaign to encourage beef consumption amounted to government speech free from First Amendment scrutiny and thus free from the obligation to communicate a competing viewpoint because the message was "effectively controlled by the Federal Government itself" and because the Secretary of Agriculture "exercise[d] final approval authority over every word used in every promotional campaign."  *Johanns*, 544 U.S. at 560–62.  When a federal law allocated Title X funds to doctors for family-planning purposes, the First Amendment did not bar the government from controlling its own speech and thus allowed it to forbid doctors from discussing abortion as a medical option with patients in the federally funded program.  *Rust v. Sullivan*, 500 U.S. 173, 178–83 (1991).  A Tennessee law permitted residents to pick "Choose Life" license plates, but not license plates with pro-choice messages, and we upheld the statute because "when the government determines an overarching message and retains power to approve every word disseminated at its behest, the message must be attributed to the government for First Amendment purposes."  *ACLU v. Bredesen*, 441 F.3d 370, 375 (6th Cir. 2006).  A town newsletter was not a public forum subject to limits on viewpoint discrimination or compelled to include contrary perspectives because the city "approved the message delivered" in the newsletter, making "its content . . . that of the city itself, not that of the quoted private citizen."  *Kidwell v. City of Union*, 462 F.3d 620, 624 (6th Cir. 2006); *see also Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Village Sch. Dist.*, 624 F.3d 332, 340–42 (6th Cir. 2010) (applying the government-speech doctrine to the curricular choices of a high school).

Like many of these programs, and most especially like the *Summum* monument policy, Warren's holiday display amounts to government speech.  The display occurred on the most governmental of government properties:  City Hall.  The City erected, maintained, took down and stored the display each year and covered the costs in doing

so.  The City reserved final approval of all components of the display to itself.  Whether it paid for components of the display, as in some instances, or accepted donations from private organizations, as in one instance (the creche), the City retained authority over what to include.  All of this explains why the Foundation wrote the Mayor, not someone else, to seek permission to add its speech to the display.  All of this supports a premise of the Foundation's Establishment Clause argument—that the display communicated the government's views.  And all of this confirms that the City maintained control over *its* seasonal message.  It could choose to include a "Winter Welcome" sign.  And it could choose to add a nativity scene (so long as it did not violate the Establishment Clause).  It could choose to add an angel.  And it could choose to keep out a devil.  It could choose to add a Santa.  And it could choose to deny a sign saying, "There is no Santa."  It could choose to incorporate a message about Ramadan.  And it could choose to deny a message disparaging any one religion or religion in general.  Just as Congress's creation of a National Day of Prayer on the first Thursday of May does not compel the legislature to recognize a National Day of Non-Prayer each year, so too the City of Warren could opt to have a holiday display without a Winter Solstice sign.

Such holiday displays are quintessentially government speech.  *Summum* came to the same conclusion in a similar setting.  And so did the Tenth Circuit in an indistinguishable setting.  It held that a holiday display constituted government speech and that Denver had no First Amendment duty to add a sign saying, "The 'Christ Child' is a religious myth," and making other similar statements to those here, to its display.  *Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1137, 1143–44 (10th Cir. 2001).

Any other approach would overhaul customary assumptions about the government's authority to state a viewpoint.  If strict neutrality were the order of the day when the government speaks for itself, as opposed to regulating the speech of others, the United States Postal Service would need to add all kinds of stamps, religious and nonreligious alike, to its December collection.  Veterans' Day would lead to Pacifism Day, the Fourth of July to Non-Patriots Day, and so on.  Beyond ways to commemorate this or that important event, the government would face even greater problems in

promoting its own policies.  Could it urge people to "Register and Vote," "Win the War," "Buy U.S. Bonds" or "Spay or Neuter Your Pets" without incurring an obligation to sponsor opposing messages?  Doubtful.  *Bredesen*, 441 F.3d at 379.  "Simply because the government opens its mouth to speak does not give every outside individual or group a First Amendment right to play ventriloquist."  *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000).

None of this, we hasten to add, gives cities and towns a blank check.  None of this frees them from the obligation to comply with the Establishment Clause or other constitutional guarantees.  That is why Warren in the aftermath of *Allegheny County* could not have put up a holiday display that contained only a nativity scene.  And none of this frees them from the push and pull of the political process—above all from accountability for their speech through the democratic process.  To that end, the Foundation retains ample ways of advocating its view and communicating its message.  As here, it may request the removal of nativity scenes as part of a holiday display—sometimes with success, sometimes without it.  It may hold demonstrations in Warren parks, pass out leaflets or spread its message in other ways.  What it cannot do is commandeer the government's own voice to deliver its message unless or until the body politic elects officials willing to add its perspective to the holiday display.

The Foundation offers several rejoinders, none convincing.  *First*, it contends that the public-forum prohibition on viewpoint discrimination should apply because private speakers may seek permission from the City to use the atrium and other rooms within City Hall.  If the City generally may not consider the content and viewpoint of these other applicants to use space in City Hall, how is it that the City can reject the Foundation's request based on less-than-content-neutral grounds?  Yet the mere existence of private speakers in a particular space does not transform all speech in all parts of the space into private speech.  *Summum* points the way.  The Pleasant Grove park contained fifteen monuments that, all nine Justices agreed, communicated government speech.  Yet if members of the Occupy Wall Street movement had chosen to set up camp next to the monuments, their signs would not have communicated

government speech any more than one man delivering *Hamlet* soliloquies would have transformed the monuments into private speech. Just as the lawn of a statehouse may serve as a forum for the announcement of an official government proclamation *and* a political rally, so too may the Warren atrium serve as a forum for the government's holiday message and unrelated private speakers.

*Second*, *Summum* emphasized the permanence of the monuments, and the Warren holiday display lasts for roughly one month each year, purportedly making it ineligible for government-speech treatment and making it more appropriate to treat the display as a public forum. But *Summum* mentioned the permanence of the monuments as one of several reasons for treating them as government speech. More to the point, the permanence of the monuments created a practical problem that applies with equal force here—accommodating all or even most requests in a finite space. 555 U.S. at 478. A forum analysis properly applies when assessing restrictions affecting private demonstrations in a park, the Court explained, because a park over time ought to be able to accommodate countless demonstrations. *Id.* By contrast, a forum approach does not properly apply when it is the government speaking (true here) and when the sought-after space is finite in terms of the structures or symbols it could accommodate (also true here). The Warren atrium has more in common with a park attempting to accommodate a limited number of monuments than a park attempting to accommodate a limitless number of demonstrations. The atrium has limited floor space, meaning that, even if the City wanted to accommodate all manner of seasonal symbols and messages, it could not do so. What's more, even though this seasonal easement on the space does not remain in place for the whole year, it is only the Thanksgiving-to-New-Year's slot during which the Foundation asked to display a message of its own. The year-to-year temporary usage of the atrium represents a difference in degree, not in kind, from the year-to-year fixed usage of a monument park.

## IV.

The Warren display also does not violate the Equal Protection Clause of the Fourteenth Amendment, which prohibits States and cities from denying individuals

"equal protection of the laws."  U.S. Const. amend. XIV, § 1.  To the extent the Foundation means to claim that the City's government speech commemorating the holiday disparately treats its preferred message, the answer is:  welcome to the crowd. Not everyone, we suspect, is happy with the City's holiday display from one year to the next.  And the Foundation, like everyone else, is free to urge the City to add or remove symbols from the display each year or to try to elect new officials to run the City—the customary answer to permissible government speech and the customary answer to policies with which citizens disagree.  Were we to grant the Foundation's request to add the Winter Solstice sign, moreover, that would place it in a *preferred* position, as no other part of the existing display contains a Madison-Avenue-like written advertisement, website included, for its stance on the holidays.  To the extent the Foundation means to argue that the rejection of its Winter Solstice display violates its fundamental rights to free speech and freedom from religious establishments, that takes us back to earlier parts of this opinion.

V.

For these reasons, we affirm.